GAGUSH *v.* HOEFT.

1. TRIAL—CONDUCT OF PLAINTIFF—DISCRETION OF COURT.
    The fact that the plaintiff in an action of breach of marriage promise, aggravated by seduction, becomes hysterical during a recess, is not reversible error where the court cautions the jury with reference thereto.

2. BREACH OF MARRIAGE PROMISE — SEDUCTION — REQUESTS TO CHARGE.
    In an action for breach of marriage promise, aggravated by seduction, a requested instruction that if the jury found that the only consideration for the promise, if any promise was made, of marriage, was a promise that, if plaintiff would submit herself to have sexual intercourse with defendant, he would marry her in case she became pregnant, and that was the only consideration, the contract rested upon an immoral consideration and was void, was improperly refused.

3. SAME—IMMORAL CONSIDERATION—VALIDITY.
    If a woman submits herself to the sexual embraces of a man solely in consideration of his promise to marry her if she becomes pregnant, such consideration is immoral and a promise based thereon is void.

Error to Wayne; Mandell, J. Submitted June 21, 1917. (Docket No. 99.) Decided September 27, 1917.

Case by Anna Gagush against William Hoeft for breach of promise of marriage accompanied by seduction. Judgment for plaintiff. Defendant brings error. Reversed.

*McHugh & Lee,* for appellant.

*Silas E. Champe (Harold McIntyre,* of counsel), for appellee.

This is an action of breach of promise aggravated by seduction resulting in the court below in a judgment in favor of the plaintiff for $2,000. The plaintiff

is a woman 35 years of age, a widow, and the mother of five children, the eldest being 17 years of age. Her husband had died in August, 1913. Defendant is 37 years of age, a widower, and the father of four children. Plaintiff claims to have met the defendant first in November, 1913, when a casual conversation lasting but a few moments occurred. It is her claim that upon the next occasion she met him, July 12, 1914, the meeting occurred in Woodmere Cemetery, where she had gone with one of her daughters to take care of her husband's grave. She testified that on that occasion he walked up to her and said, "How do you do?" inquired of her where her husband's grave was, how old her children were, and told her the ages of his own; that he inquired how much she paid for her husband's headstone, and told her how much he had paid for that of his wife. Plaintiff then testified in part as follows:

"*Q.* What other subject did you and Mr. Hoeft talk about besides the headstone and your children?
"*A.* Well, about marrying me. He asked me how I would like to have him for my man, and I said, 'Why, Mr. Hoeft, you don't want me; I am poor, and your family would not like to have me marry you.' He said, 'I don't want any one else; I just want you.' * * * When he asked me if I would like him for my man, I said, 'Why, Mr. Hoeft, you don't know me, and you ask me that the first,' and he said, 'I have known you a long time and been watching you many times, been watching many times for you,' and I said, 'I am so homely and poor, and you can find some one you like better,' and he said, 'I don't want any one else; you look like a girl;' and he said, 'Will you marry me?' And he looked right in my eyes, and I said, 'I will.' "

With reference to the seduction she testified as follows:

"There was a small path he led me, and I said, 'Mr. Hoeft, I don't want to walk here; I believe there are snakes.' He said, 'Nothing can harm you as long as

I am with you.' He got the place and put his coat on the grass like this and put his arms out and said, 'Kiss me, you are mine,' pulled me in and got me to sit on the ground by pulling and hugging and insisting, and forced me to submit to him. He did this after he made the promise to marry me. He talked about marriage, and he said not to worry one bit, he would keep his word; he was a man; had sense; no one could part him from me. He seemed awfully good to me. He took out his handkerchief and wiped my forehead and told me not to worry one bit, for he knew that if I got into the family from that time he would stay home to-morrow and go down and get a marriage license, and I was not to worry, and he would marry me as soon as he could."

Upon cross-examination with reference to the seduction and the alleged promises to marry she testified:

"He did tear my underwear. He tore it all to pieces; not the top clothes, but the underwear. He forced me to submit to him. I would not have permitted him if he had not forced me. He also told me that if I would submit to him, that he would take care of me if I got in the family way. I would not have submitted to him if he had not made that promise. He promised to marry me first; when I got in the family way he would marry me. If I got in the family way or not, he promised to marry me. He promised me first before going to the back of the cemetery, right by the grave. When he forced me to submit to him by strength, he made the promise that he would marry me if I got in the family way, and he promised to marry me over at the grave again. I relied upon that promise. I let him proceed. I would not have submitted under any consideration if he did not make that promise. On the 13th he promised even if I did not be in the family way he promised to marry me. There was a promise of marriage if I got in the family way on the 13th. I would not have submitted then if it was not for that promise; I don't think I would in such a place as that. That state of affairs took place on the 12th of July and on the 12th and 26th. They were all alike promises of marriage of marrying me if

I got in the family way on each time, and I would not have submitted if he did not promise to marry me. When he forced me to submit to him I would not have submitted if that promise had not been given. He overpowered me. His strength and his promise is what made me submit."

Defendant categorically denied every assertion made by the plaintiff except that he had a casual acquaintance with her and had spoken with her on a very limited number of occasions. No witness aside from the parties themselves was present or testified to the promise of marriage except the 12-year-old daughter of plaintiff. Considerable testimony was introduced with reference to alleged conversations between the parties to the action and others subsequent to the alleged breach of the contract tending, if believed, to cast discredit upon the claims of both parties.

BROOKE, J. (*after stating the facts*). The first 16 assignments of error are based upon alleged errors in the refusal of the court to charge as requested by defendant and to the charge as given. These assignments will be discussed later.

Assignments 17, 18, 19, 20, and 22 are based upon alleged errors in receiving or excluding testimony. With reference to these assignments it is sufficient to say that we find them without merit.

Assignment 21 is based upon the ruling of the court in refusing to declare a mistrial on account of the action of the plaintiff, who during a recess appears to have become hysterical. This matter was one addressing itself to the sound discretion of the trial court, who cautioned the jury with reference thereto in such manner as to fully meet the requirements of the situation.

The 24th assignment of error is based upon alleged errors committed by counsel for plaintiff in his final argument to the jury. It is unnecessary to hold that

the language used by counsel constitutes. reversible error, for the reason that the case must go down for a new trial upon another ground, but it may be said that the language used was open to criticism, and should be avoided upon another trial.

The 7th assignment of error is based upon the refusal of the court to give defendant's 11th request to charge, which is as follows:

"I charge you that, if you find in this case that the only consideration for the promise, if there is any promise in the case, of marriage, was a promise that, if she would submit herself to have sexual intercourse with him, he would marry her in case she became pregnant, if you find that was the only consideration, the only arrangement or contract, then I instruct you that that is a contract resting upon an immoral consideration and is void, and the plaintiff could not recover."

The court upon this point charged the jury:

"Now, gentlemen of the jury, there is one thing that I know I have omitted, and that is this, the plaintiff claims that the seduction that she claims occurred in this case followed the promise to marry, and that without the promise to marry she would not have submitted herself to the defendant. The defendant claims that there is evidence in the case that the seduction was based upon a promise to marry in case of the seduction resulting in the birth of a child.

"Now, gentlemen of the jury, if you should find from a consideration of the evidence that the seduction was brought about by reason of promise of marriage in case, and only in case, the plaintiff should become in the family way by reason of this seduction, then, gentlemen of the jury, no damages can be awarded because of the seduction, and your consideration must be given only to the charge of the promise to marry. I state that because the plaintiff's claim is that the seduction was based solely and alone upon the promise to marry. Now, putting that in another way, I will say this the plaintiff is entitled to recover damages for both the breach of promise to marry, in case you find that there was a promise, and the seduction only in

case you should find the seduction was based solely and alone upon the general promise to marry and upon no other promise. In case you should find that the seduction was based upon the promise to marry in case the plaintiff became in the family way, then, gentlemen of the jury, this action resolved itself into a question whether or not the plaintiff is entitled to recover damages by reason of the breach of promise to marry, and that alone."

This identical question was raised in the case of *Jaskolski* v. *Morawski,* 178 Mich. 325 (144 N. W. 865). There plaintiff had secured a judgment for breach of promise of marriage accompanied by seduction. There the claim was made on behalf of appellant that the promise of marriage was void because the consideration was immoral. We there said:

"Counsel cite authorities which he claims sustain his contention. We have examined them, but we do not deem it necessary to decide whether he is right in his contention for the trial judge held with him, and instructed the jury."

Then follows the charge of the court to the jury upon this question, in the course of which the trial judge said:

"Now, should you find the fact to be that the defendant promised plaintiff solely upon the consideration that she should permit him to have sexual intercourse with her, or solely on consideration that she should have sexual intercourse with him, and if she became pregnant and had a child he would marry her, and that there was no other consideration or promise, then and in such case I instruct you that the promise to marry rests upon an immoral consideration and is void, and your verdict should be for the defendant."

We sent that case back for a new trial upon other grounds, but this portion of the charge was not disapproved by this court. While it may be said that it was not distinctly approved and a citation from the case of *Spellings* v. *Parks,* 104 Tenn. 351 (58 S. W.

126), might be construed as indicating the contrary, we are of opinion that the instruction is sound and should have been given without qualifications in the case at bar.

If the plaintiff submitted herself to the sexual embraces of the defendant solely in consideration of his promise to marry her if she became pregnant, such consideration would clearly be immoral, and defendant's promise based thereon would be void. The following cases are authority upon this point: *Davie* v. *Padgett,* 117 Ark. 544 (176 S. W. 333) ; *Boigneres* v. *Boulon,* 54 Cal. 146; *Hanks* v. *Naglee,* 54 Cal. 51 (35 Am. Rep. 67) ; *Judy* v. *Sterrett,* 153 Ill. 94 (38 N. E. 633) ; *Eve* v. *Rogers,* 12 Ind. App. 623 (40 N. E. 25) ; *Saxon* v. *Wood,* 4 Ind. App. 242 (30 N. E. 797) ; *Sramek* v. *Sklenar,* 73 Kan. 450 (85 Pac. 566) ; *Donallen* v. *Lennox,* 6 Dana (Ky.), 89; *Edmonds* v. *Hughes,* 115 Ky. 561 (74 S. W. 283) ; *State* v. *Howard,* 264 Mo. 386 (175 S. W. 58) ; *Button* v. *Hibbard,* 82 Hun (N. Y.), 289 (31 N. Y. Supp. 483) ; *Steinfeld* v. *Levy,* 16 Abb. Prac. (N. S.) 26; *Baldy* v. *Stratton,* 11 Pa. 316; *Spellings* v. *Parks,* 104 Tenn. 351 (58 S. W. 126) ; *Burke* v. *Shaver,* 92 Va. 345 (23 S. E. 749) ; *Connolly* v. *Bollinger,* 67 W. Va. 30 (67 S. E. 71, 20 Am. & Eng. Ann. Cas. 1350) ; *Beaumont* v. *Reeve,* 8 Q. B. (Eng.) 483. See, also, 5 Cyc. p. 1000, note 12.

We are not unmindful of the fact that plaintiff gave testimony which would tend to support the theory that a promise to marry was given before and quite independent of the alleged seduction. Her testimony upon cross-examination, however, was such as to warrant, we think, the submission of the question to the jury under the request proposed by defendant's counsel.

The judgment is reversed, with costs, and a new trial ordered.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, STEERE, and FELLOWS, JJ., concurred.